J. ALBERT JOHNSON & others[1] vs. SASCHA BLACKE,
temporary executrix.[2]

No. 90-P-1223.

Norfolk. January 17, 1992. - April 9, 1992.

Present: KASS, PORADA, & LAURENCE, JJ.

*Attorney at Law*, Contingent fee agreement, Compensation. *Words*, "Gross."

A law firm's contingent fee agreement, providing payment of 20% of the gross amount collected on behalf of its client, applied to the entire amount ($1,000,000) recovered in a settlement negotiated by the firm, even though the amount would be reduced by taxes [402-403]; and the fee, in the circumstances, was not unreasonable [403].

CIVIL ACTION commenced in the Superior Court Department on September 20, 1988.

The case was heard by *George N. Hurd, Jr.*, J.

*Randall B. Warren* for the defendant.

*John F. Mee* (*Francis E. Hartig* with him) for the plaintiffs.

KASS, J. Within twenty-four hours of subscribing on April 21, 1988, to a written settlement of four Superior Court actions,[3] arrived at with the assistance of counsel and under the supervision of a Superior Court judge, Sonja B. Loew repudiated the agreement which had been hammered together. To represent her in upsetting the settlement agree-

---

[1] John F. Mee and Thomas J. May. The three plaintiffs are members of a partnership for the practice of law known as Johnson, Mee & May.

[2] A suggestion of death of the original defendant, Sonja B. Loew, was filed in the Appeals Court on October 28, 1991. A motion to substitute the temporary executrix, Sascha Blacke, was subsequently allowed. For convenience we refer to Sonja B. Loew as the defendant.

[3] The four actions were consolidated into one action, number 85-2211 on the docket of the Superior Court in Norfolk County.

ment, Sonja selected the plaintiffs and, when they succeeded, disputed the meaning and reasonableness of the written[4] contingent fee agreement she had entered into with them. Those issues were decided adversely to Sonja (by a judge of the Superior Court other than the one who had presided over the April 21, 1988, settlement) and a judgment for the plaintiffs was entered in the amount of $200,000. From that judgment Sonja has appealed. We affirm.

What had led to the short-lived settlement were contests involving the estate of Elias M. Loew (E.M.), a motion picture theatre magnate who had died in 1984. Sonja had been married to E.M. from 1935 to 1948, when they divorced.[5] Sonja continued to live at what had been her marital residence at 435 Brush Hill Road, Milton. So did E.M. Loew, from time to time until his death, as well as the second Mrs. Loew and another actor in the settlement, Sascha Blacke, whom Sonja and E.M. had taken into their household as a small child. Sonja "formally" (the adverb is the judge's) adopted Sascha after E.M.'s death.

The settlement contained four major points:

(1) Sonja was to have the use of 435 Brush Hill Road so long as she made it her permanent residence; while Sonja occupied the place, E.M.'s estate would pay all the expenses of running the property (one infers from the record that it is sizeable), including repairs, insurance, taxes, caretaker's salary, and utilities.

(2) The estate would establish a trust with a corpus of $1,000,000, the income to be paid to Sonja for life, Sonja to have the right to appoint twenty-five percent of the trust principal (it was to be subject to limited invasion) by will, the remainder to be distributed to Sascha on Sonja's death.

(3) The estate would pay an aggregate $600,000 for the legal fees run up by Sonja ($350,000) and Sascha ($250,000).

---

[4]See S.J.C. Rule 3:05, 382 Mass. 762 (1981).

[5]We have taken our facts from findings made by the judge who presided at the trial of the fee dispute.

(4) Sonja was to convey property at 505 Brush Hill Road to the estate.

A financial adviser to Sonja dispatched to the Superior Court judge who had presided over the settlement a long letter asking that the judge reconsider the terms of the settlement. The judge was unimpressed with the morning-after recantation and incorporated the settlement agreement in a final judgment. Any lawyer was at that point bound to view glumly the prospects of undoing the settlement, and seven lawyers whom Sonja interviewed either declined the case altogether or proposed substantial retainers or contingent fees ranging from thirty to forty percent of what would be recovered. Mr. Johnson, after some haggling with Sonja — she said she could not possibly pay the retainer for which Mr. Johnson had asked — set a comparatively modest contingent fee. What Sonja wanted was the $1,000,000 free of trust — i.e., the contest was now between her and Sascha.[6] Mr. Johnson's law firm entered into a contingent fee agreement with Sonja which, in pertinent detail, provided that:

> "The parties agree that the fee charged to the Client for legal services rendered by the Firm, including that of any associate counsel, . . . is not to exceed Twenty percent (20%) of the gross amount collected free and clear of any and all trusts, on behalf of the Client."

Negotiations between Mr. Johnson and Sascha's lawyer followed in an excited style and at a hectic pace. Counsel for the estate was also drawn in from time to time as the estate would have to agree to modifications in the trust, albeit at no adverse financial consequence so far as the estate was concerned. The terms of a new settlement were arrived at between September 13 and September 18, 1988, and on Septmber 20, 1988, the parties were once again before the Superior Court judge. Mr. May, a partner of Mr. Johnson,

---

[6]Sonja also wanted another tilt at the estate for back alimony from E.M. or compensation for services to E.M. Mr. Johnson gave his opinion that there was no chance of success for either claim.

appeared for Sonja. Revisions to the settlement were approved by which Sonja: (1) would receive $1,000,000 outright; (2) agreed to provide by her will that Sascha would receive $200,000; (3) would transfer to Sascha her one-half interest in real estate at 985 Metropolitan Avenue, Hyde Park; and (4) would execute an agreement confirming title in Sascha to a Steinway concert grand piano. The balance of the earlier April 21 agreement, much of it to Sonja's advantage, remained as before.

Sonja had announced her position that the professional services of the plaintiffs had not brought about the revised settlement as soon as she heard of its terms from Johnson. Messrs. Johnson, Mee & May brought an action on their contingent fee agreement. The Superior Court judge who heard that case found that the plaintiffs had been the efficient cause of the revised settlement, which had caused $1,000,000 to be paid outright to Sonja. That conclusion is not challenged on appeal.

The principal contention on appeal is that the twenty percent factor in the contingent fee agreement ought not to be applied to the entire $1,000,000. Under the original settlement of April 21, Sonja argues, she was entitled to invade trust principal to pay State and Federal taxes resulting from the transaction. Sonja estimates that the tax bite would have been about $333,000; therefore, Messrs. Johnson, Mee & May had improved her position by only $666,000. That basis for the contingent fee factor she thought ought further to be reduced by the value of her surrender of interests in the Hyde Park property and the piano.

Those contentions ignore that the contingent fee agreement was for "twenty percent (20%) of the *gross* amount collected free and clear of any and all trusts" (emphasis supplied). The word "gross" ordinarily means "whole, entire, total." *London Guar. & Acc. Co.* v. *Jacobson*, 241 Mass. 255, 257 (1922). In ordinary usage, "gross" means without refining adjustments. So, in *Gerokoulis* v. *Cohen*, 340 Mass. 54, 55-56 (1959), an agreement by clients in a land damage case to pay their lawyer fifteen percent "of the gross settlement

obtained" was held to refer to the entire amount of the settlement, although sixty-five percent of the amount was deducted by the taking authority to discharge an outstanding mortgage. In addition, the judge had found that a principal objective of Sonja had been to receive the $1,000,000 free of trust, and that was precisely what Messrs. Johnson, Mee & May had achieved.

Sonja's fallback position is that the fee charged is unreasonable as matter of law. On the record, this is an entirely untenable posture. The trial judge considered the factors contained in S.J.C. Rule 3:07, DR 2-106(B), as amended, 382 Mass. 772 (1981). He found that in a market sense, the contingent fee percentage factor was well within bounds; the effort required of the plaintiffs in a relatively short time span was considerable; and they accomplished a good result for their client in the face of long odds against her. The judge could also have found, on the basis of the evidence, that the plaintiffs had immersed themselves in Sonja's case to the extent that they precluded themselves from other profitable employment and that the fee charged was commensurate with the experience, reputation, and ability of the plaintiffs.

*Judgment affirmed.*